1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9    DIGBY ADLER GROUP LLC,          )  Case No. 10-cv-00617-SC
                                     )
10            Plaintiff,             )  ORDER ON CROSS MOTIONS FOR
                                     )  SUMMARY JUDGMENT
11        v.                         )
                                     )
12                                   )
     IMAGE RENT A CAR, INC., et al., )
13                                   )
              Defendants.            )
14                                   )
                                     )
15                                   )
                                     )
16                                   )
                                     )
17   _____)

18

19   **I.   INTRODUCTION**

20        Now before the Court are two motions for summary judgment.

21   One is brought by Plaintiff Digby Adler Group, LLC.  ECF No. 122

22   ("Pl.'s Mot.").  The other is brought by Defendant Gad Sebag.  ECF

23   No. 134 ("Sebag Mot.").  Both motions are fully briefed,[1] and the

24   Court deems them suitable for disposition without oral argument

25   pursuant to Civil Local Rule 7-1(b).  For the reasons set forth

26   below, Plaintiff Digby Adler Group, LLC's motion for summary

27   _____
     [1] ECF Nos. 128 ("Defs.' Opp'n"), 135 ("Pl.'s Reply"), 142 ("Pl.'s
28   Opp'n"), 144 ("Sebag Reply").

United States District Court
For the Northern District of California

judgment is GRANTED in part and DENIED in part, and Defendant Gad Sebag's motion for summary judgment is DENIED.

## II.  BACKGROUND

### A.   Factual Background

Plaintiff Digby Adler Group, LLC ("Digby") has operated a van rental service under the name Bandago, LLC ("Bandago") through its website, bandago.com, since 2003.  ECF No. 124 ("Laguana Decl.") ¶¶ 1-2.  On August 31, 2010, the United States Patent and Trademark Office ("PTO") issued federal trademark registration number 3839689 to Digby for the BANDAGO mark.  ECF No. 123 ("Rosenfeld Decl.") Ex. 18.

The defendants in this matter are two individuals -- Gad Sebag and Schneior Zilberman -- and two companies -- Image Rent A Car, Inc. ("Image") and Van Rental Co., Inc. ("Van") (Van and Image will be referred to collectively as the "Corporate Defendants").  Mr. Zilberman operated a third rental car company called Adir Rent A Car, Inc., from 1996 through 2004.  ECF No. 129 ("Zilberman Decl.") ¶¶ 3-8.  Adir folded in 2004, when a dispute with the car dealership that supplied its inventory resulted in the supplier refusing to let Adir use its cars.  Id. ¶¶ 6-8.  Mr. Zilberman's personal finances and credit were seriously damaged in the process. Id. ¶ 9.  So Mr. Zilberman approached Mr. Sebag -- his brother-in-law -- asking for financial assistance to start a new company.  Id. ¶ 9.  Mr. Sebag agreed to form a rental car company, serve as its CEO, loan money to the company, and allow Mr. Zilberman to use his credit rating to obtain cars.  ECF No. 130 ("Sebag Decl. I") ¶¶ 7, 9).  However, according to both Mr. Sebag and Mr. Zilberman, Mr.

2

United States District Court
For the Northern District of California

Zilberman alone would control all of the company's operations. Id.; Zilberman Decl. ¶¶ 14, 17-19.

In October 2004, Defendant Image Rent A Car, Inc. ("Image") was incorporated under the law of New York State. ECF No. 21-4 ("Sebag Decl. II") at 1. Mr. Sebag filed for incorporation and was the company's CEO (though the corporate record kept by the New York Department of State reflects the name "Gao Sebaf") and sole shareholder; he also described Image as "my company." ECF No. 137 Ex. 13 at 16[2]; Rosenfeld Decl. Exs. 16, 42 at 14:3-11 (Sebag "owned and initiated [Image and Van]"), 44 at 30:10-13. Defendant Shneior Zilberman served as Image's general manager. Id. Ex. 2 at 1. Image operated a car and van rental service primarily in New York, though it also had offices in Florida. Id. Image marketed its rental service through its website, imagerentacar.com. Id. Exs. 4-5 at Responses 19-20. Image's bylaws were simply blank form bylaws, without even the name of the corporation filled in. ECF No. 137 Ex. 13 at 17-66. Though the bylaws require a board of directors with at least three directors, Image never had a board of directors. Id. Ex. 13 at 2. Nor do Image's records indicate that it ever held shareholder meetings or keep corporate minutes. Id. Ex. 13 at 2, 15-66.

Defendant Van Rental Co., Inc. ("Van") was incorporated under the law of New York State in July 2007. Rosenfeld Decl.d. Ex. 17.

_____

[2] Plaintiff's initial filing of the Rosenfeld Declaration (ECF No. 123) included an exhibit that failed to redact certain personal information. Pursuant to the Court's order, the initial filing was expunged from the record and replaced with a properly redacted version. See ECF Nos. 138, 141. As a result, exhibits 11-13 of the Rosenfeld Declaration have a different electronic court filing number than the other 56 exhibits.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Initially founded with the objective of expanding Image's business into new areas, Van was defunct almost from the start and never actually operated.  Id. Ex. 42 at 4:6-19, 5:6-12.  Mr. Sebag was Van's CEO and sole shareholder.  Id. Exs. 1 at 1, 42 at 14:3-11. Mr. Zilberman, who served as Van's president, recalls that Van either owned "none or very few" vehicles.  See Id. Exs. 26 at 3, 42:14-19.  Van's finances were run through Image, and the two companies operated essentially as one entity.  Rosenfeld Decl. Ex. 42 at 8:14-18, 10:3-4.

In August of 2008, Van registered the domain name bandago.net (recall that Digby's website was bandago.com).  Id. Ex. 7 at 6; Ex. 31.  Though the account with the domain registrar listed Van as the owner, the contact email address supplied was info@imagerentacar.com.  Id. Ex. 31 at 3.  There was no website at bandago.net; the site simply redirected visitors to Image's website.  Sebag Decl. II at 2.  In addition to registering the bandago.com domain, Defendants bid on the Google AdWords search terms "bandago," "bandago van rental," and "bandago van rentals" (the "Bandago Search Terms").  Rosenfeld Decl. Ex. 23.  Google AdWords is a service that lets customers bid on certain search terms, so that the customer's website will show up as advertisement when Google visitors search for those terms.  Defendants paid for advertisements that would direct users to Image's website when they searched for the Bandago Search Terms.  Id. Ex. 24.  The Google AdWords account was registered in Mr. Sebag's name, but Mr. Zilberman operated the account.  Id. Exs. 9 at 2, 35.

On July 1, 2007, Digby's CEO, Sharky Laguana, created content for the Bandago website.  The text on the website described

**United States District Court**
For the Northern District of California

1   Bandago's vans and rental services.  Laguana Decl. ¶ 11, Ex. 3.

2   Digby applied for a copyright registration to cover the text of the

3   website, and the PTO granted the registration on January 31, 2011.

4   Rosenfeld Decl. Exs. 19-20.  Virtually identical text (sometimes

5   modified very slightly to reflect Image's name and locations)

6   appeared on Image's website.  See id. Exs. 52-59.

7       On April 27, 2010, Philippe Naim (Mr. Sebag's uncle) formed a

8   corporation called Group Travel Solution, Inc. ("GTS").  Id. Exs.

9   49 at 8:6-23; 60.  Mr. Naim recalls that GTS purchased Image's

10  assets, including vehicles, phones, and websites.  Id. Ex. 49 at

11  9:2-4.  He does not recall exactly how many vehicles GTS purchased,

12  but guesses that the number was "[b]etween fifty and sixty."  Id.

13  at 9:5-11.  Digby asserts that GTS purchased 78 cars for one dollar

14  each.  See Pl.'s Mot. at 10.  In support, Digby cites to GTS' 2010

15  tax returns -- a 39-page exhibit -- with no pincite or explanation.

16  But those returns indicate only that GTS owned some large number of

17  vehicles, and the tax returns do not indicate the vehicles' source

18  or sources.  See Rosenfeld Decl. Ex. 50 (filed under seal) at 11,

19  16-19, 22-27, 37-38.  GTS' tax returns do, however, reflect the

20  sale of 20 of the vehicles, and the sale prices and proceeds show

21  that each was originally acquired for $1.  See id. at 11, 24-27.

22  On March 24, 2011, Van and Image filed for bankruptcy.  Id. Exs.

23  25-26.

24      **B.   Procedural History**

25      This case was filed on February 11, 2010.  See ECF No. 1

26  ("Compl.").  The transfer of assets described above therefore took

27  place after the filing of this lawsuit but before Van and Image

28  declared bankruptcy.  When the Corporate Defendants filed for

1  bankruptcy, the Court stayed this case pending the outcome of the

2  bankruptcy proceedings.  <u>See</u> ECF No. 90 ("Stay Order").  On May 23,

3  2014, the bankruptcy court dismissed both bankruptcy proceedings.

4  <u>See</u> ECF No. 96 Exs. A-B.  On June 16, 2014, the Court granted

5  Digby's unopposed motion to lift the stay.  <u>See</u> ECF No. 97.  Digby

6  then moved for summary judgment, alleging that Mr. Sebag and Mr.

7  Zilberman are personally liable for Van and Image's actions because

8  all defendants are alter egos of one another and because officers

9  and directors of a corporation are liable for torts they authorize

10 or in which they participate.  Pl.'s Mot. at 19-21.

11     Defendants opposed the motion, but they conceded that the

12 Corporate Defendants are liable for trademark and copyright

13 infringement.  They also concede two of the elements of

14 cybersquatting.  <u>See</u> Defs.' Opp'n at 1.  However, Defendants argue

15 that Mr. Sebag and Mr. Zilberman are not alter egos of Van or Image

16 and that Mr. Sebag is not personally liable as an officer or

17 director.  Mr. Sebag then moved for summary judgment on the grounds

18 that he cannot be held liable for the Corporate Defendants'

19 actions.  <u>See</u> Sebag Mot.

20

21 **III.  <u>LEGAL STANDARD</u>**

22     Entry of summary judgment is proper "if the movant shows that

23 there is no genuine dispute as to any material fact and the movant

24 is entitled to judgment as a matter of law."  Fed. R. Civ. P.

25 56(a).  Summary judgment should be granted if the evidence would

26 require a directed verdict for the moving party.  <u>Anderson v.</u>

27 <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 251 (1986).  The moving party

28 bears the initial burdens of production and persuasion.  <u>Nissan</u>

**United States District Court**
For the Northern District of California

1  <u>Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099,

2  1102 (9th Cir. 2000).

3

4  **IV. <u>DISCUSSION</u>**

5      The Court begins with a discussion of the Corporate

6  Defendants' liability, and then proceeds to analyze whether Mr.

7  Sebag or Mr. Zilberman may be held liable for the Corporate

8  Defendants' actions.

9      **A.    <u>The Corporate Defendants</u>**

10      Defendants do not vigorously contest the allegations against

11  the Corporate Defendants.  In fact, Defendants concede liability as

12  to the trademark infringement and copyright infringement claims.

13  Defendants also concede that two of the three elements of Digby's

14  cybersquatting claim are met, but they contest the third.  The

15  Court examines each cause of action in turn.

16      **1.    <u>Trademark Infringement</u>**

17      "To establish a trademark infringement claim . . . , [Digby]

18  must establish that [Defendants are] using a mark confusingly

19  similar to a valid, protectable trademark of [Digby's]."

20  <u>Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.</u>, 174 F.3d 1036,

21  1046 (9th Cir. 1999).  It is undisputed that Digby has registered

22  the Bandago mark.  <u>See</u> Rosenfeld Decl. Ex. 18.  Digby's

23  "registration of the mark on the Principal Register in the Patent

24  and Trademark Office constitutes prima facie evidence of the

25  validity of the registered mark and of [Digby's] exclusive right to

26  use the mark on the goods and services specified in the

27  registration."  <u>Id.</u> at 1047.  Digby asserts that Defendants'

28  registration of the bandago.net domain and bids on the Bandago-

**United States District Court**
For the Northern District of California

related Google AdWords constitute use of the Bandago mark.
Defendants do not dispute that Van and Image's conduct constitute
trademark infringement; in fact, Defendants concede that Van and
Image are liable for infringement of Digby's mark.  <u>See</u> Defs.'
Opp'n at 1, 11-12.  Accordingly, the Court finds Van and Image
liable for trademark infringement.  Digby's motion is GRANTED with
respect to the allegations that Van and Image infringed upon
Digby's trademark.

### 2.    <u>Copyright Infringement</u>

"A plaintiff who claims copyright infringement must show: (1)
ownership of a valid copyright; and (2) that the defendant violated
the copyright owner's exclusive rights under the Copyright Act."
<u>Ellison v. Robertson</u>, 357 F.3d 1072, 1076 (9th Cir. 2004).  "A
copyright registration is 'prima facie evidence of the validity of
the copyright and the facts stated in the certificate.'"  <u>United
Fabrics Int'l, Inc. v. C&J Wear, Inc.</u>, 630 F.3d 1255, 1257 (9th
Cir. 2011) (quoting 17 U.S.C. § 410(c)).  It is undisputed that
Digby has a registered copyright for the text of the bandago.com
website.  <u>See</u> Rosenfeld Decl. Exs. 19-20.  It is also undisputed
that the Corporate Defendants used language copied almost verbatim
from Digby's website on the Image website (though they did so
before the copyright was registered).  <u>See</u> <u>id.</u> Exs. 52-59.  Once
again, Defendants concede that Van and Image infringed upon Digby's
copyright.  <u>See</u> Defs.' Opp'n at 1, 11-12.  The Court finds Van and
Image liable for copyright infringement.  Digby's motion for
summary judgment is GRANTED with respect to the allegations that
Van and Image infringed upon Digby's copyright.
///

**United States District Court**
For the Northern District of California

### 3.   Cybersquatting

"The Anti-Cybersquatting Consumer Protection Act ["ACPA"] establishes civil liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" DSPT Int'l, Inc. v. Nahum, 624 F.3d 1213, 1218-19 (9th Cir. 2010). Digby alleges that (1) Defendants registered and used the bandago.net domain name; (2) the bandago.net domain name is identical to the Bandago mark; and (3) that Defendants acted with bad faith intent to profit from that mark.

With respect to the cybersquatting claim, Defendants concede the first two elements: they admit that Van and Image registered the bandago.net domain name and that "bandago.net" is identical to Digby's Bandago mark. See Defs.' Opp'n at 9. However, Defendants allege that there is a genuine dispute of material fact regarding the bad faith requirement. The ACPA sets out nine factors to consider in determining whether an alleged cybersquatter acted in bad faith. 15 U.S.C. § 1125(d)(1)(B)(i). But because the ACPA factors are permissive and not exhaustive, the Ninth Circuit has emphasized that courts "need not, however, march through the nine factors seriatim . . . . [I]nstead, the most important grounds for finding bad faith are the unique circumstances of the case . . . ." Lahoti v. VeriCheck, Inc., 586 F.3d 1190, 1202 (9th Cir. 2009).

Nonetheless, the parties both discuss the ACPA factors, so it seems appropriate to begin the discussion there. Some of the factors are uncontroversial: it is undisputed, for example, that

Defendants have no intellectual property rights to the Bandago mark, that bandago.net does not consist of Defendants' legal name, that Defendants never used the domain name in connection with the bona fide offering of any goods or services, and that Defendants never engaged in a bona fide noncommercial use of the mark in a site accessible under the domain name.  More importantly, it is clear that Defendants intended to divert consumers from Digby's website.  Digby has shown that Defendants registered the bandago.net domain name -- which Defendants acknowledge is identical to Digby's Bandago mark -- and set up that domain to redirect to Defendants' own website.  Because Digby and Image were competing van rental companies, it is evident that this was an attempt to divert Digby's business.  Sebag Decl. II at 2. Defendants do not contest this factor in their opposition brief. See Defs.' Opp'n at 10-11.  Those factors, therefore, favor Digby. On the other hand, it also undisputed that Defendants never offered to sell or transfer the domain to Digby, so that factor favors Defendants.  The parties dispute the remaining factors, so the Court will address each in turn.

The seventh bad faith factor is provision of misleading or false contact information.  The bandago.net domain was registered to Van.  Rosenfeld Decl. Ex. 31.  Digby argues that Van was a fictitious entity designed only to shield Image from liability, and so the contact information was misleading because it concealed Image's involvement, even though it provided Image's true phone number, email, and address.  See Digby Mot. at 14.  However, Digby cites no authority in support of that interpretation of "misleading."  Defendants emphasize that Van used its actual

**United States District Court**
For the Northern District of California

address.  See Defs.' Opp'n at 10.  Indeed, given that Digby previously argued that Van and Image shared a physical address, phone numbers, and email addresses, see Digby Mot. at 7, it seems that little concealment was actually involved.  If this factor favors Digby at all, the Court assigns it very little weight.

The eighth bad faith factor is Defendants' registration of multiple domain names confusingly similar to others' marks.  Here, Digby points out that Defendants registered the domains whizzcarhire.com and albacarhire.com, which are similar to other car rental companies' internet domains.  See Digby Mot. at 14-15. Defendants respond that Whizz Car appears to be located in Singapore, Alba Car appears to be located in Spain, and that Plaintiffs have provided no evidence that either company existed when Defendants registered those domains.  Again, the Court finds that this factor is not terribly persuasive in this situation.

The ninth bad faith factor is the extent to which the mark at issue is or is not distinctive and famous.  Defendants apparently acknowledge that the Bandago mark is distinctive, but they contest whether it is famous.  See Defs.' Opp'n at 11.  Once more, this factor is not very persuasive for either side.

Ultimately, the statutory factors are not hugely helpful in making a bad faith determination in this case, except for the intentional diversion factor.  Five of the factors undeniably favor Digby; the sixth favors Defendants; and the last three are either neutral or not very important given the facts of this case.  The Court finds that the most important factor in this case is the fifth: that Defendants intended to divert consumers from Digby's website.  Combined with the first four factors, which establish

**United States District Court**
For the Northern District of California

that Defendants had no legitimate interest in using the Bandago
mark, the intent to divert consumers is a powerful indication of
Defendants' bad faith.  However, that does not end the inquiry, as
it is the broader circumstances of this case that finally resolve
the issue.

In the cybersquatting context, the Ninth Circuit has held that
the unique circumstances of the case are the most important
consideration in determining bad faith.  The most persuasive facts
in this case are that Defendants not only registered a domain name
that they admit was identical to the Bandago mark, but they bid on
Google AdWords to redirect consumers to the Image website.  That
is, Defendants were not content merely to redirect visitors who
accidently typed "bandago.net" instead of "bandago.com" into their
browsers.  Instead, Defendants actively attempted to manipulate
search engines to show the Image website as a result when consumers
searched for "bandago" and related terms.  It is hard to understand
why Defendants would want to do that, unless they intended to use
the Bandago mark to generate business for themselves.  Indeed,
Defendants offer no alternative explanation.  Given these facts,
the Court finds that there is only one reasonable interpretation of
the evidence: Defendants acted in bad faith because they registered
the bandago.net domain solely to take advantage of Digby's
goodwill, reputation, and name recognition in the Bandago mark.

Because the Court finds that Defendants acted with the bad
faith intent to profit from Digby's mark, all three elements of
cybersquatting are satisfied.  The Court finds that Van and Image
are liable for cybersquatting.  Digby's motion for summary judgment
is GRANTED with respect to the allegations of cybersquatting by Van

and Image.

**B.   The Individual Defendants**

Digby asserts that Mr. Zilberman and Mr. Sebag are both personally liable for the torts committed by the Corporate Defendants.  Digby alleges that Mr. Zilberman and Mr. Sebag may be held liable directly and via an alter ego theory.  Defendants concede that Mr. Zilberman may be personally liable for the Corporate Defendants' torts, but they contest Mr. Sebag's responsibility.[3]  In fact, Mr. Sebag's personal liability is the subject of Defendants' own motion for summary judgment.

**1.   Schneior Zilberman**

"A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."  Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1021 (9th Cir. 1985) (internal quotation marks omitted).  The parties agree that this principle extends to copyright and trademark infringement claims. See Digby Mot. at 20; Defs.' Opp'n at 12; see also Foreverendeavor Music, Inc. v. S.M.B., Inc., 701 F. Supp. 791, 793-94 (W.D. Wash. 1988) (president of corporation liable for corporation's infringement because he was "the dominant influence" in the

---

[3] Defendants apparently concede Mr. Zilberman's liability as an officer involved in the Corporate Defendants' torts, but they contest his liability as an alter ego.  Compare Defs.' Opp'n at 12 ("Defendants concede that Zilberman personally participated in the events leading to the domain registration.") and 13 ("Zilberman was solely responsible for Image's advertising and marketing, and solely responsible for Image's website"), with Defs.' Opp'n at 16 ("Defendants respectfully submit that disputed issues of fact exist as to whether Image or Van are Zilberman's alter egos.").

corporation); <u>Polo Fashions, Inc. v. Branded Apparel Merch., Inc.</u>, 592 F. Supp. 648, 652 (D. Mass. 1984) (officer individually liable because he was a "moving, active conscious force behind" the corporation's infringement").

Defendants acknowledge that Mr. Zilberman was responsible for the registration of the bandago.net domain name and that Mr. Zilberman was "solely responsible for Image's advertising and marketing," managed Image and Van's website and internet accounts, and ran Image and Van's day-to-day operations. <u>See</u> Defs.' Opp'n at 12-13; Zilberman Decl. ¶¶ 14, 17-19. Mr. Zilberman admits that he "personally participated in the events leading to the domain registration." <u>Id.</u> at 12. Mr. Zilberman also says that he "was responsible for Image's day-to-day operations, its management, and supervising employees." Zilberman Decl. ¶ 15. Defendants do not explicitly concede Mr. Zilberman's liability (as they do for Van and Image), but these admissions are sufficient for the Court to find that Mr. Zilberman directed and participated in the torts committed by Image and Van. As a result, the Court finds that Mr. Zilberman is liable on the copyright infringement, trademark infringement, and cybersquatting causes of action described above. Digby's motion for summary judgment is GRANTED with respect to Mr. Zilberman's liability. Because the Court finds that Mr. Zilberman is directly liable for these torts, the Court need not reach the issue of Mr. Zilberman's alter ego liability.

### 2. <u>Gad Sebag</u>

Mr. Sebag's liability is contested. Digby claims that he is liable both as a direct participant in the various torts alleged and that Van and Image's liability can be imputed to him because

1  the Corporate Defendants are Mr. Sebag's alter egos.

2                      **i.   Direct Liability**

3       Digby argues that Mr. Sebag must have directed or participated

4  in the Corporate Defendants' torts because he incorporated both Van

5  and Image, was the sole shareholder of both companies, and was

6  Van's only officer and employee.  Reply at 3.  Mr. Sebag's personal

7  credit card was also used to register the bandago.net domain name,

8  and Mr. Sebag was listed as the account holder for the Corporate

9  Defendants' Google AdWords accounts.  Id.  Mr. Sebag counters that

10 he was barely involved in either corporation.  He recounts that Mr.

11 Zilberman (his brother-in-law) came to him for help, and he agreed

12 to let Mr. Zilberman form and operate the corporations under his

13 name and use his credit.  Mr. Sebag says he did so to help a family

14 member, and that Mr. Zilberman needed his help because Mr. Sebag

15 had funds and better credit.  Sebag Decl. I ¶¶ 6-7.  Mr. Sebag

16 recalls signing certain incorporation documents and loaning money

17 to Image, but says that he "did not have any role" in "Image's

18 management or operations."  Id. ¶ 11.  Mr. Zilberman's testimony

19 corroborates this: he testifies that he, and not Mr. Zilberman,

20 managed both Image and Van.  Zilberman Decl. ¶¶ 14, 17-19.

21 According to Mr. Zilberman, Mr. Sebag was only involved in the

22 companies when his signature was required for something, which was

23 "rare."  Id. ¶ 16.  Mr. Sebag never received a salary or any other

24 type of compensation from Image.  Id. ¶ 15.

25      Digby asserts that Mr. Sebag's declaration is a self-serving

26 declaration that contradicts his earlier statements and documentary

27 evidence.  The Court disagrees.  Mr. Sebag's declaration does not

28 contradict any of the evidence Digby has presented.  If it is true

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

that Mr. Sebag entrusted Mr. Zilberman to use Mr. Sebag's name to found Image and Van, then it makes sense that Image and Van were incorporated under Mr. Sebag's name and used his name for their accounts.  If Mr. Sebag had contradicted his prior deposition testimony, then the Court might have found his declaration to be a sham.  See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991) ("The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.").  Rejecting Mr. Sebag's declaration in this manner requires a factual finding that the contradiction actually was a sham.  Id. at 267.  The Court cannot make such a finding here, and therefore cannot strike Mr. Sebag's declaration as a sham.  It is, therefore, inappropriate for the Court to make credibility determinations or to draw from the evidence inferences adverse to Defendants.  See His & Her Corp. v. Shake-N-Go Fashion, Inc., 572 F. App'x 517, 518 (9th Cir. 2014) ("In resolving summary judgment motions, a court must not weigh the evidence, make credibility determinations, or draw inferences from the facts adverse to the non-moving party.").

Because the Court cannot discount Mr. Sebag's declaration, the evidence provides for at least two reasonable interpretations of the facts.  A trier of fact could select either depending on the credibility it assigns to Mr. Sebag and Mr. Zilberman's statements. If the trier of fact believed Mr. Sebag and Mr. Zilberman, then it could find that Mr. Sebag did not direct or participate in any of the Corporate Defendants' torts.  In that scenario, Mr. Sebag would not be directly liable.  On the other hand, a trier of fact could also reasonably discount Mr. Sebag and Mr. Zilberman's testimony

**United States District Court**
For the Northern District of California

1  and find that the documentary evidence indicates that Mr. Sebag had

2  a much larger role in Image and Van than he admits.  It would

3  certainly be possible for the trier of fact to <u>infer</u> from the

4  documentary evidence that Mr. Sebag was heavily involved in the

5  management and operation of the Corporate Defendants.  In that

6  case, Mr. Sebag might be held liable for Image and Van's torts as a

7  participant.  However, the Court is required to draw inferences

8  from the evidence in favor of the non-moving party.  As a result,

9  the Court cannot draw the inferences required to hold Mr. Sebag

10 directly liable.  However, nor can the Court weigh the evidence in

11 such a way as to find that Mr. Sebag was <u>not</u> involved in the

12 Corporate Defendants' torts.  The Court finds that a genuine

13 dispute of material fact exists as to whether Mr. Sebag was

14 involved in the Corporate Defendants' torts.  Both motions for

15 summary judgment are DENIED as to Mr. Sebag's direct liability.

16          **ii.  <u>Alter Ego Liability</u>**

17      "The alter ego doctrine arises when a plaintiff comes into

18 court claiming that an opposing party is using the corporate form

19 unjustly and in derogation of the plaintiff's interests. . .  In

20 certain circumstances the court will disregard the corporate entity

21 and will hold the individual shareholders liable for the actions of

22 the corporation . . . ."  <u>Mesler v. Bragg Mgmt. Co.</u>, 39 Cal. 3d

23 290, 300, 702 P.2d 601 (Cal. 1985) (internal citation omitted).

24 The parties agree that California law governs the alter ego dispute

25 in this case.  <u>See</u> Mot. at 21 n.7; Opp'n at 14-15.  There are "two

26 general requirements" for a plaintiff to pierce the corporate veil:

27 "(1) that there be such unity of interest and ownership that the

28 separate personalities of the corporation and the individual no

1   longer exist and (2) that, if the acts are treated as those of the

2   corporation alone, an inequitable result will follow." Id.

3         California courts have developed a long list of factors to

4   consider when deciding whether it is proper to pierce the corporate

5   veil.  Those factors are:

6

7         the commingling of funds and other assets; the failure to
          segregate funds of the individual and the corporation;
8         the unauthorized diversion of corporate funds to other
          than corporate purposes; the treatment by an individual
9         of corporate assets as his own; the failure to seek
          authority to issue stock or issue stock under existing
10        authorization; the representation by an individual that
          he is personally liable for corporate debts; the failure
11        to maintain adequate corporate minutes or records; the
          intermingling of the individual and corporate records;
12        the ownership of all the stock by a single individual or
          family; the domination or control of the corporation by
13        the stockholders; the use of a single address for the
          individual and the corporation; the inadequacy of the
14        corporation's capitalization; the use of the corporation
          as a mere conduit for an individual's business; the
15        concealment of the ownership of the corporation; the
          disregard of formalities and the failure to maintain
16        arm's-length transactions with the corporation; and the
          attempts to segregate liabilities to the corporation.

17  Mid-Century Ins. Co. v. Gardner, 9 Cal. App. 4th 1205, 1213 n.3

18  (Cal. Ct. App. 1992).  However, "[t]his long list of factors is not

19  exhaustive. The enumerated factors may be considered [a]mong others

20  under the particular circumstances of each case." Zoran Corp. v.

21  Chen, 185 Cal. App. 4th 799, 812 (Cal. Ct. App. 2010) (internal

22  quotation marks omitted).

23        Some of the enumerated factors favor Digby, and some favor

24  Defendants.  For example, it is undisputed that Van and Image

25  failed to maintain corporate minutes or records, that Mr. Sebag was

26  Image's only shareholder, that Van and Image were inadequately

27  capitalized (they declared bankruptcy shortly after this lawsuit

28  was filed), and that Van and Image completely disregarded corporate

United States District Court
For the Northern District of California

formalities.  Those factors, therefore, favor a finding that Van
and Image were Mr. Sebag's alter egos.  On the other hand, there is
conflicting evidence regarding <u>control</u> of the corporations by their
stockholders: Digby asserts that Mr. Sebag ran both corporations,
while Mr. Sebag says he was only nominally involved.  Additionally,
while there is some evidence that Van may have been a shell
corporation to shield Image, there is not much evidence that
Defendants tried to conceal Mr. Sebag's involvement in either
corporation.

When considering the facts of this case, the outcome is again
heavily dependent on the credibility of Mr. Sebag's and Mr.
Zilberman's statements and the inferences drawn from the
documentary evidence.  If the trier of fact were to find Mr. Sebag
and Mr. Zilberman unreliable, it might infer from the documentary
evidence that Mr. Sebag was deeply involved in controlling the
Corporate Defendants.  Such a finding might support a decision that
Van and Image truly were Mr. Sebag's alter egos.  However, if the
trier of fact were to find Mr. Sebag and Mr. Zilberman to be
credible, then it would be reasonable to find that there was little
unity of interest and ownership between Mr. Sebag and the Corporate
Defendants or that it would be equitable to find piercing the
corporate veil unnecessary.

Digby points out that corporate officers are generally not
excused from their responsibilities merely because they consider
themselves to be figureheads.  <u>See</u> Digby Opp'n at 18-19.  That is
true, but the cases Digby cites are all in the context of
establishing the officer's duties to his company.  While Mr. Sebag
may have done the Corporate Defendants and their shareholders (in

**United States District Court**
For the Northern District of California

1   this case, only Mr. Sebag himself) a disservice by failing to

2   fulfill his role as CEO, that failure does not require the Court to

3   overlook his general lack of involvement when determining alter ego

4   liability.  Mr. Sebag's neglect of his official duties does not

5   automatically make him an alter ego of Image simply by virtue of

6   the fact that he was the CEO and sole shareholder.

7       Deciding the issue of Mr. Sebag's liability as an alter ego of

8   Image or Van requires drawing inferences from the evidence and

9   weighing the credibility of evidence and witnesses.  At this stage,

10  all inferences must be drawn in favor of the non-moving party, and

11  it is inappropriate to determine credibility.  Because there are at

12  least two reasonable explanations of the evidence, each of which

13  requires drawing inferences in favor of the moving party or making

14  a credibility determination, it is inappropriate to grant summary

15  judgment for either party on this issue.  Both motions for summary

16  judgment are DENIED as to Mr. Sebag's liability as an alter ego for

17  the Corporate Defendants.

18      **C.    Damages**

19      Digby seeks statutory damages for its cybersquatting claim and

20  disgorgement of profits for its trademark and copyright

21  infringement claims.  See Digby Mot. at 24.

22          **1.    Statutory Damages for Cybersquatting**

23      A party that prevails on a claim of cybersquatting may elect

24  to recover "instead of actual damages and profits, an award of

25  statutory damages in the amount of not less than $1,000 and not

26  more than $100,000 per domain name, as the court considers just."

27  15 U.S.C. § 1117(d).  Digby requests the maximum statutory damages

28  of $100,000.  Digby Mot. at 24.  In determining appropriate

statutory damages for cybersquatting,

> courts generally consider a number of factors . . .
> including the egregiousness or willfulness of the
> defendant's cybersquatting, the defendant's use of false
> contact information to conceal its infringing activities,
> the defendant's status as a "serial" cybersquatter --
> i.e., one who has engaged in a pattern of registering and
> using a multitude of domain names that infringe the
> rights of other parties -- and other behavior by the
> defendant evidencing an attitude of contempt towards the
> court or the proceedings.

<u>Verizon Cal. Inc. v. Onlinenic, Inc.</u>, C 08-2832 JF (RS), 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009).  Courts in similar cases have awarded a range of damages.[4]

In this case, the Court has found that Defendants' cybersquatting was willful and, if not egregious, certainly more pernicious than simply registering a suspiciously similar domain name.  However, the evidence of false contact information and Defendants' status as "serial cybersquatters" is decidedly mixed. There is no evidence of an attitude of contempt toward the court or proceedings.  In a recent cybersquatting case, the undersigned awarded $50,000 in statutory damages where there was powerful evidence of the defendant's bad faith and status as a serial cybersquatter, and where the defendant had shown contempt for the

---

[4] <u>See, e.g.</u>, <u>Partners for Health & Home, L.P. v. Yang</u>, 488 B.R. 109 (C.D. Cal. 2012) (awarding $25,000 for domain through which defendant had sold products willfully infringing on plaintiff's trademarks); <u>Wecosign, Inc. v. IFG Holdings, Inc.</u>, 845 F. Supp. 2d 1072, 1085-87 (C.D. Cal. 2012) (awarding $50,000 where defendant had provided false contact information to the domain registrar but no other factors were present); <u>Verizon Cal. Inc. v. Onlinenic, Inc.</u>, C 08-2832 JF (RS), 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009) (awarding $50,000 per violation where all four factors were present); <u>Citigroup, Inc. v. Shui</u>, 611 F. Supp. 2d 507, 513 (E.D. Va. 2009) (awarding $100,000 where defendant's use of the domain was "sufficiently willful, deliberate, and performed in bad faith").

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Court by refusing to appear or respond to summonses.  See Ploom,

2   Inc. v. iPloom, LLC, No. 13-CV-05813 SC, 2014 WL 1942218, at *7-8

3   (N.D. Cal. May 12, 2014).  Here, the Court finds that an award of

4   $25,000 appropriately captures the egregiousness of Defendants'

5   violation of the law.

6           **2.    Actual Damages for Trademark and Copyright**

7                   **Infringement**

8       Both the Lanham Act and the Copyright Act permit a prevailing

9   plaintiff to recover the defendant's profits.  See 15 U.S.C. §

10  1117(a); 17 U.S.C. § 504(b).[5]  In the copyright context, "the

11  _____

12  [5] Defendants argue briefly that that Digby must elect between
    statutory and actual damages because Digby's claims are based on
13  the same underlying conduct.  In support they cite a single
    unreported case from this District, in which the court declined to
14  award both statutory and actual damages.  However, the court
    emphasized that the decision was discretionary.  See Media Lab,
15  Inc. v. Collis, No. C08-04732 HRL, 2010 WL 3893582, at *6 (N.D.
    Cal. Sept. 30, 2010).  Digby responds by pointing to a number of
16  out-of-district cases in which courts held that the ACPA permits an
    award of both statutory and actual damages.  See St. Luke's
17  Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1204
    (11th Cir. 2009) ("Congress, by statute, has prescribed recovery
18  under the ACPA even if it is duplicative of other damages
    awarded."); Wecosign, Inc. v. IFG Holdings, Inc., 845 F. Supp. 2d
19  1072, 1085 (C.D. Cal. 2012) ("A prevailing plaintiff may recover
    statutory damages under this provision in addition to actual
20  damages for infringement of its trademark.").  The Court agrees and
    holds that a plaintiff recover both statutory damages for
21  cybersquatting and actual damages for trademark or copyright
    infringement.  However, it is also true that Defendants' copyright
22  violation (the use of text from Digby's website on the Image
    website) arose from different conduct than the trademark and
23  cybersquatting claims (registration of the bandago.net domain).
    Digby argues that the trademark claim also arose from different
24  conduct than the cybersquatting claim, because the trademark claim
    is based on Defendants' Google AdWords bids, while the
25  cybersquatting claim is based on registration of the bandago.net
    domain.  Whether bidding on AdWords alone is sufficient to
26  establish a trademark violation is a question that the parties have
    not briefed and that is not before the Court.  To resolve the
27  current case, it is sufficient to hold that Digby may recover both
    statutory damages for cybersquatting and actual damages for the
28  same conduct, and that Defendants' copyright infringement arose

United States District Court
For the Northern District of California

copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504.  In the trademark context, "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C § 1117(a).  The Lanham Act also provides some additional guidance for assessing damages in trademark cases:

> In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.

Id.

"Trademark remedies are guided by tort law principles. . . . As a general rule, damages which result from a tort must be established with reasonable certainty." Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993) (internal citations and quotations omitted).  Damages "will not be awarded in the absence of credible evidence demonstrating injury to plaintiff resulting from defendant's sales.  Damage awards for lost sales and profits may not be based upon the assumption that a trademark infringement resulted in commercial injury." Invicta Plastics (USA) Ltd. v. Mego Corp., 523 F. Supp. 619, 624 (S.D.N.Y. 1981) (cited in Lindy, 982 F.2d at 1408).  Thus Digby must show some evidence of injury as

from different underlying conduct than Defendants' cybersquatting.

United States District Court
For the Northern District of California

a result of Defendants' conduct before it can recover Defendants' ill-gotten profits.

Digby asserts that Defendants reaped $3,583,264.00 in revenues between January 2009 and May 2010.  See Rosenfeld Decl. Exs. 28-29; Mot at 25.  Apparently, that figure was reached simply by adding up every deposit to Defendants' various bank accounts during that period.  See Rosenfeld Decl. Ex. 29.  Defendants argue that Digby's figures vastly overstate the Corporate Defendants' profits -- in fact, they assert that Van and Image operated at a loss.  Defs.' Opp'n at 22-25.

It is true that Digby's damages calculations are based on a number of astonishingly unreasonable assumptions.  First, Digby assumes that it suffered some commercial injury sufficient to support an award of actual damages.  Next, Digby assumes that every deposit in the Corporate Defendants' accounts was a sale or revenue.  That is not necessarily the case; for example there is evidence that Mr. Sebag loaned Image over $200,000.  See Digby Mot. at 7.  Third, Digby assumes that all of the Corporate Defendants' revenues were attributable to their infringement.[6]  However, while Digby's claimed damages are simply ludicrous in light of the evidence, Defendants are also culpable for the difficulty involved in calculating damages in this case: Image claims it has no profit and loss statements or balance sheets, and Mr. Zilberman indicated that he "might have disposed of" Image's books and records.  See

---

[6] The law does permit Digby to make this assumption and places the burden of showing the portion of profits not attributable to infringing activity on the defendant.  However, the Lanham Act makes clear that principles of equity must guide the Court in determining damages.  The unreasonableness of this assumption is described in greater detail below.

**United States District Court**
For the Northern District of California

1    ECF No. 137 Exs. 13 at 11-12; 43 at 65:2-66:8.

2        To succeed on its claim for disgorgement of profits, Digby

3    must provide a reasonably reliable estimate of Defendants' profits

4    from their van rentals.  The sum of all deposits to Defendants'

5    bank accounts is insufficient.  "The court cannot award profits

6    without any evidentiary basis on which to rest such an award."

7    Louis Vuitton S.A. v. Spencer Handbags Corp., 597 F. Supp. 1186,

8    1190 (E.D.N.Y. 1984) aff'd, 765 F.2d 966 (2d Cir. 1985).  Digby has

9    failed to establish Defendants' revenues to a reasonable certainty.

10       Nor is it clear that Digby suffered any actual loss at all

11   from Defendants' trademark or copyright infringement.  Apparently,

12   Defendants bid on 14,057 keywords with their AdWords accounts.  See

13   Rosenfeld Decl. ¶ 22.  The evidence shows that 14 (or 0.1%)

14   included the word "bandago."  See id. Ex. 23.  Of those 14 AdWords,

15   only three generated any clicks at all.  Each of those three

16   keywords generated exactly one click.  See id. Ex. 23.  In other

17   words, Defendants' bids on infringing keywords from November 2008

18   to April 2009 resulted in a total of three visits to Defendants'

19   website.  Even assuming all three visits were from different users,

20   that each would have rented from Bandago absent the advertisements,

21   and that each of those users proceeded to rent vans from Defendants

22   instead, Digby's actual damages attributable to the infringing

23   AdWords must have been vanishingly small.

24       With respect to Defendants' copyright infringement, Defendants

25   copied only a few paragraphs of text from the Bandago website.

26   That text was fairly generic, and tended to describe a

27   specialization in large vans for extended trips.  See Rosenfeld

28   Decl. Exs. 52-53.  The copied text invariably appeared at the very

1  bottom of a long page of non-infringing text describing Image's

2  passenger van rental options.   Id.   Neither Digby nor Defendants

3  sold the copyrighted material, so the only cognizable lost profits

4  attributable to copyright infringement are the proceeds from those

5  customers induced by the infringement to rent vans from Defendants

6  instead of Bandago.   There is no evidence whatsoever indicating

7  that a single customer was swayed by the infringing text.[7]

8      Digby's motion for summary judgment is therefore DENIED with

9  respect to its claim for disgorgement of profits.

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27

28

_United States District Court_
_For the Northern District of California_

---

[7] Digby mentions actual confusion only once in its moving papers.
It asserts, with no evidentiary basis, that it "received several
inquiries about the relationship between Plaintiff and Defendants."
Digby Mot. at 17.

## V.  CONCLUSION

For the reasons set forth above, Plaintiff Digby Adler Group, LLC's motion for summary judgment is GRANTED in part and DENIED in part.  The motion is granted as to Digby's claims for copyright infringement, trademark infringement, and cybersquatting against Defendants Image Rent A Car, Inc., Van Rental Co., Inc., and Schneior Zilberman.  Digby's motion is DENIED with respect to Defendant Gad Sebag's liability.  Mr. Sebag's motion for summary judgment is also DENIED.  The Court finds that Digby is entitled to $25,000 in statutory damages, but that Digby's evidence is insufficient to support summary judgment for disgorgement of profits.  Thus two issues remain in this case: (1) Mr. Sebag's liability, both directly and as an alter ego, for the Corporate Defendants' torts; and (2) the amount of actual damages to which Digby is entitled (if any).  The Court will refrain from entering judgment in this matter until those remaining issues are fully adjudicated.


IT IS SO ORDERED.


Dated: February 6, 2015                                      _____
                                                            UNITED STATES DISTRICT JUDGE